Below is an opinion of the court.

_____
DAVID W. HERCHER
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>**Bonni Lyn Blevins**,<br><br>Debtor. | Chapter 13<br><br>Case No. 19-33947-dwh13 |
| **Credit Associates, Inc.**, an Oregon corporation,<br><br>Plaintiff,<br><br>v.<br><br>**Bonni Lyn Blevins; Citadel Servicing Corp.**; and **Wilmington Trust N.A.**, not in its individual capacity but solely as trustee of MFRA trust 2015-2,<br><br>Defendants. | Adversary Proceeding No. 20-03002-dwh<br><br>MEMORANDUM DECISION FOR DEFENDANT BONNI LYN BLEVINS<br><br>NOT FOR PUBLICATION |

**I.     Background**

Credit Associates, Inc., filed this action against the chapter 13 debtor, Bonni Lyn Blevins,

and other defendants against whom claims are no longer pending. The only remaining claim is

Page 1 – MEMORANDUM DECISION FOR DEFENDANT BONNI LYN BLEVINS

for a determination that her debt to Credit Associates is nondischargeable under 11 U.S.C. § 523(a)(2) and (a)(4). Trial was on November 18, 2020.

For the reasons that follow, I hold that Credit Associates has failed to demonstrate that Blevins's debt to it is nondischargeable.

## II. Facts

Blevins's husband, Freddie Blevins, died in 2015.[1] Freddie had been a patient of St. Charles Medical Center and had incurred medical debts,[2] and Credit Associates acts as St. Charles's debt collector.[3] St. Charles took a small-claims judgment for roughly $13,000 jointly against Blevins and Freddie in 2015.[4]

Blevins cares for her children and grandson, and in 2018 she undertook to care for her widowed mother.[5] In the hope of obtaining a bigger house where her family could live together, Blevins began in 2018 to work with Stewart Williams of Premier mortgage to refinance her home mortgage.[6] He told her that there were two judgments against the property that would have to be satisfied as part of the refinance.[7] It appears undisputed that one of the two judgments was Credit Associates' 2015 small-claims judgment for medical bills.

Blevins spoke to St. Charles in an effort to negotiate a treatment of the medical judgment, but St. Charles told her the claim was assigned to Credit Associates.[8]

---

[1] Joint Statement of Agreed Facts, docket item (DI) 112 (Joint Facts), at 3 ¶ 5.
[2] Joint Facts at 3 ¶¶ 6, 8.
[3] Joint Facts at 3 ¶ 9.
[4] Joint Facts at 3 ¶ 10.
[5] Joint Facts at 3 ¶¶ 11-13.
[6] Joint Facts at 4 ¶ 14-15.
[7] Joint Facts at 4 ¶ 16.
[8] Joint Facts at 4 ¶¶ 18-19.

Williams put Blevins in touch with lawyer Don Reeder, who assisted her to prepare a small-estate affidavit for the purpose of transferring the family home into her own name as a step toward refinancing it.[9] Meanwhile, St. Charles and Credit Associates had been trying to collect on a second medical debt, apparently arising from Freddie's illness, and in November 2018, Credit Associates filed a new complaint against Blevins and served her with a summons.[10]

The following month, with Reeder's assistance, Blevins filed a small-estate affidavit, which the parties agree contained two false statements: first, that there were no unpaid claims against the decedent's estate, and second, that there were no claims against the estate that Blevins disputed.[11]

In February 2019, Credit Associates communicated with AmeriTitle and gave instructions for the satisfaction of its 2015 judgment as part of the pending refinance.[12] About two weeks later—before the expiration of the deadline for filing claims against the small estate—Blevins signed a deed transferring the property to herself.[13] The refinance closed on February 28, 2019, and she granted a trust deed against the property to secure a $110,000 loan that was used to pay the mortgage and the two judgments against the property.[14] Part of that amount, $12,745, was paid to Credit Associates on to satisfy its judgment lien.[15]

---

[9] Joint Facts at 4-5 ¶¶ 19, 21-22.
[10] Joint Facts at 4 ¶ 20.
[11] Joint Facts at 5 ¶¶ 23-24.
[12] Joint Facts at 5 ¶ 25.
[13] Joint Facts at 5 ¶ 26.
[14] Joint Facts at 6 ¶ 28.
[15] Joint Facts at 6 ¶ 29.

The 2018 action by Credit Associates against Blevins had not been reduced to judgment when the refinancing and encumbrance of the property occurred in late February. Credit Associates filed a second amended complaint on May 21, 2019.[16]

In March 2019, Credit Associates filed and served a claim against the small estate in the amount of $81,279.65 and later moved for summary determination of the claim.[17] In April 2019, while that motion was pending, Reeder applied to withdraw from representing Blevins in the small-estate proceeding, and the court granted the application.[18] She responded to the summary-determination motion on her own,[19] but in July 2019, the court ruled against her,[20] and in September 2019, the court ordered her to pay $65,732.42 to Credit Associates.[21]

It's not disputed that, because Blevins did not identify Credit Associates as a creditor having an outstanding (or disputed) claim against the estate, Credit Associates did not receive notice of the small-estate proceeding until after she had transferred the property to herself and encumbered it in late February.[22] Fisher testified that the property was worth $172,000 (the amount that Blevins listed in her bankruptcy asset schedule as its value)[23] and that the property had equity of approximately $115,000 before the refinance.[24]

The key factual dispute is Blevins's state of mind. Credit Associates maintains that she intentionally made the false statements in her affidavit, knowing that Credit Associates' residual claim was still outstanding and would not be paid through the refinancing process. She contends

---

[16] Ex. 8.
[17] Joint Facts at 6 ¶ 31.
[18] Joint Facts at 6 ¶¶ 33-34.
[19] Joint Facts at 7 ¶ 35.
[20] Joint Facts at 7 ¶ 36-37.
[21] Joint Facts at 7 ¶ 38.
[22] Trial audio recording at DI 118, starting at 9:02 a.m. (Recording 1), at elapsed time 17:00.
[23] Main case (no. 19-33947-dwh13) docket item 23, item 1.1.
[24] Recording 1 circa 9:20 a.m.

that she didn't understand the distinction between that residual claim and the existing judgment and honestly, but mistakenly, believed that the 2015 judgment, which she knew was in the process of being paid off through the refinance, represented the entire debt to Credit Associates. She also testified that Reeder told her that (1) he would run a credit check on her,[25] (2) "everything came back clear,"[26] and (3) "everything's going to be paid."[27] I infer from her testimony that she thought that a credit check would identify all debts that needed to be paid to allow the refinancing to occur.

As Credit Associates' president, Wesley Fisher, acknowledged in his testimony, Freddie's entire debt to St. Charles existed in 2015, when the first state-court action was filed.[28] Credit Associates could therefore have included the entire debt in its claim against Blevins in 2015. Nevertheless, because of an anomaly in the way that Credit Associates kept track of debts it received from St. Charles, the person responsible for initiating the 2015 litigation was not aware of the entire amount, and the state-court action ended up being filed for a relatively small part of it.[29] No one argues that this approach estopped Credit Associates from later filing its second action to collect the balance, but it does lend credence to Blevins's contention that she thought the 2015 judgment represented the entire debt. After all, she had no reason to expect Credit Associates to demand only a portion of its debt in 2015, given that the entire amount was owing at that time.

Blevins testified that she did not realize that any statement she made in the affidavit was false. I accept her testimony that her goal was not to cheat Credit Associates but to take the

---

[25] Recording 1 circa 10:01 and 10:56 a.m.
[26] Recording 1 circa 10:13 a.m.
[27] Recording 1 circa 10:50 a.m.
[28] Recording 1 at elapsed time 23:20.
[29] Recording 1 at elapsed time 24:00-26:30.

necessary steps to get her finances in order for the benefit of her family[30] and that she relied on the advice given her by professionals.[31] She also testified that she had very little understanding of the process—a conclusion that I would have reached even if she hadn't stated it expressly.[32] Her answers to technical questions were often confused and demonstrated a lack of understanding.

It was apparent that Blevins didn't understand the legal relationship between the 2015 judgment and the residual claims. She referred to what she apparently perceived as Credit Associates' attempts to enlarge the amount owed on the 2015 judgment by later asserting that additional amounts were due.[33] Fisher testified without contradiction that Credit Associates informed Blevins during an October 2018 phone call that she was liable for debts in addition to the 2015 judgment.[34] But her testimony implied that she viewed this as an attempt to enlarge the 2015 judgment rather than to collect separate, additional debts.[35] She also testified—as I would have inferred anyway—that she didn't understand the difference between a judgment lien against the property and a personal liability on the underlying medical debt.[36]

Although Blevins's lawyer, Christopher Mertens, did not elaborate on or draw attention to it, she also made a stray remark that she learned in 2018—shortly before she was served with the second collection action—that there were two judgments against the property rather than

---

[30] Trial audio recording at DI 119, beginning at 10:26 a.m. (Recording 2), at elapsed times 6:50-10:30, 24:15-25:00, 32:30-32:45.
[31] Recording 2 at elapsed time 31:50-32:30.
[32] Recording 2 at elapsed times 4:00, 30:45-31:00.
[33] Recording 2 at elapsed time 27:30-28:00 ("$13,000 . . . that you were trying to add to after the fact . . ..").
[34] Recording 2 at elapsed times 37:00-37:45, 39:00-39:30.
[35] Recording 2 at elapsed time 27:30-28:00.
[36] Recording 2 at elapsed time 31:15-31:30.

one.[37] Given her vague understanding of the meaning of a judgment lien, it's plausible that she believed that the second judgment reflected the same debt that was being asserted against her in 2018. In reality, the second judgment lien was in favor of a different creditor. But, to a layperson who doesn't know the difference between a judgment and a claim, the coincidence that she learned about a judgment shortly before receiving notice of a new claim might have led her to believe that the new claim was simply the second "judgment" that she had just learned about— and that Williams had assured her would be paid through the refinance. Because Mertens did not make this argument, I hesitate to draw this inference definitively, but I consider it plausible. And, if it's correct, it goes a long way toward explaining the otherwise hard-to-explain fact that her February 2019 affidavit denied the existence of any unresolved or disputed claims.

Although the confused quality of Blevins's testimony unfortunately made it difficult to draw conclusions about exactly what she did and didn't know, I infer that she believed that the 2015 judgment was the sole embodiment of Freddie's medical debt. At most, she understood the 2018 litigation as an attempt to enlarge the amount of the 2015 judgment rather than as an attempt to collect debts that were not involved in the 2015 judgment. And again, because the entire debt existed before the 2015 small-claims litigation, this misunderstanding is plausible. Blevins made it clear that she believed that the refinance would satisfy the entire medical debt.

A major subject of Credit Associates' examination of Blevins was the fact that she appeared through counsel (Mertens, her lawyer in this action) and filed an answer in the 2018 litigation in January 2019—one month before she filed the small-estate affidavit wrongly saying that there were no unpaid claims *or disputed claims* against the small estate.[38] Credit Associates'

---

[37] Recording 2 at elapsed time circa 9:00.
[38] Trial Exhibit (Ex.) 1 at ¶¶ 10-11.

Page 7 – MEMORANDUM DECISION FOR DEFENDANT BONNI LYN BLEVINS

lawyer repeatedly asked Blevins for an explanation, but she could give none, and her answers persuade me that she genuinely didn't understand the questions.[39] For example, she testified that Mertens represented her in the 2018 litigation to contest the roughly $13,000 amount reflected in the 2015 judgment. Although Mertens did represent her in the 2018 litigation, the purpose of that litigation was not to contest the 2015 judgment. It was to collect amounts totaling $67,577.34, which are different from the amount reflected in the 2015 judgment. Yet, when pressed, Blevins adamantly insisted that Mertens's representation in the 2018 litigation addressed the 2015 judgment.[40] Again, I'm left with the impression that she viewed, and perhaps still views, the 2018 litigation as an effort to increase the size of the 2015 judgment rather than as an independent attempt to collect other debt.

Credit Associates also emphasized an emailed letter[41] written by Reeder, the lawyer who initially represented Blevins in the small-estate proceeding, to Paul Sumner, another lawyer who took over her representation after a conflict of interest arose regarding one of Reeder's other clients. In the letter, Reeder described his plan to prepare a deed transferring the property from the small estate to Blevins personally. He acknowledged that the four-month period in which creditors could file claims against the small estate had not expired, but said he would "take the chance" of going ahead with the transfer without waiting out the four months.[42]

Credit Associates argues that this statement shows Reeder's intent to advise Blevins to violate the small-estate statute by transferring the property without waiting for the four-month period to end. And it invites me to infer that Reeder in fact so advised Blevins, and that she then

---

[39] Recording 2 at elapsed time 25:30-28:00.
[40] Recording 2 at elapsed times 25:45-26:00, 27:30-29:00.
[41] Ex 10-B.
[42] Ex 10-B.

Page 8 – MEMORANDUM DECISION FOR DEFENDANT BONNI LYN BLEVINS

acted on that advice, knowing that it was unlawful. I can't make that inference. Nothing that Reeder said in the letter implies that he advised his client to break the law, nor does any other evidence. Both Reeder and Blevins were indeed taking a chance by executing the deed before the four-month period ended, because the decision to do so caused Blevins to become personally liable for Credit Associates' claim.[43] But that doesn't allow me to conclude that Reeder knew that the statements in the affidavit were false, much less that he warned her that they were false.

## III. Law

### A. Section 523(a)(2)

The alleged fraud does not involve any statement about Blevins's financial condition, so the operative provision of section 523(a)(2) here is subdivision (a)(2)(A).

Under the law that prevailed in the Ninth Circuit before 2010, a plaintiff alleging fraud under section 523(a)(2)(A) had to prove, among other things that the debtor knowingly made false representations on which the creditor relied.[44] If that were still the law, Credit Associates could not prevail on its (a)(2)(A) theory. There is no evidence that Blevins ever made any false representations to Credit Associates or that it relied on any false representations that she made to others. Credit Associates certainly was aware of its claim, even if no one else was.

In 2010, the Supreme Court held in *Husky International Electronics, Inc. v. Ritz*[45] that a false representation is not an indispensable element of a subdivision (a)(2)(A) claim. But the Court did not explain what the elements of fraud are. Instead, it held only that fraud "connotes deception or trickery" and that a common-law fraudulent conveyance is a species of fraud if it is

---

[43] Ex 3.
[44] *See, e.g., In re Sabban*, 600 F.3d 1219, 1222 (9th Cir. 2010).
[45] 136 S. Ct. 1581 (2016).

Page 9 – MEMORANDUM DECISION FOR DEFENDANT BONNI LYN BLEVINS

done with actual intent to defraud.[46] Credit Associates has not argued that its claim involves a common-law actually fraudulent conveyance.

Nevertheless, I concluded in ruling on Blevins's motion to dismiss[47] and on Credit Associates' motion for summary judgment[48] that the claim is sufficiently within the traditional definition of fraud that it satisfies the requirements of section 523(a)(2)(A)—if Credit Associates could demonstrate that Blevins had made intentional misrepresentations in her small-estate affidavit. I adhere to that conclusion. But as I explained earlier, I can't find that Blevins's misrepresentations were intentional. Her understanding of the circumstances was so vague and confused that her statements cannot be described as intentionally deceptive.

A section 523(a)(2)(A) creditor need not prove that a debtor's motives were ignoble. But Credit Associates did not attempt to prove that Blevins was willfully ignorant, reckless, or otherwise to blame for her profound lack of understanding. Instead, it argued that she *did* understand the facts but intentionally misrepresented them, and I have found otherwise.

### B. Section 523(a)(4)

I have already concluded that Blevins was a fiduciary under section 523(a)(4).[49]

A fiduciary defalcation can be a misappropriation of property held in trust or a failure to account for trust funds.[50] The plaintiff must also prove that the fiduciary debtor committed the defalcation either intentionally or with a state of mind that amounts to criminal recklessness—in

---

[46] *Id.* at 1586.
[47] DI 35.
[48] DI 103 (audio of oral ruling).
[49] DI 35.
[50] *In re Hemmeter*, 242 F.3d 1186, 1190 (9th Cir. 2001).

Page 10 – MEMORANDUM DECISION FOR DEFENDANT BONNI LYN BLEVINS

other words, that the debtor consciously disregarded a substantial and unjustifiable risk of harm to the creditor.[51]

The analysis under this subdivision is essentially the same as that under subdivision (a)(2)(A). Credit Associates needed to show that Blevins either knew that her actions would result in the harm that occurred or that she consciously disregarded an unjustifiable risk of harm. Because I've found that she believed her statements were true—however poor her understanding of those statements—I can't conclude that she acted intentionally or recklessly.

Again, the argument could be made that an affiant who files an affidavit that she doesn't understand is behaving recklessly, but Credit Associates has not attempted to demonstrate that this is what happened.

### IV. Conclusion

Credit Associates has not demonstrated that Blevins's debt to it is nondischargeable under section 523(a)(2) or (4). I will enter judgment for her.

# # #

---

[51] *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 274 (2013).